# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

| | | |
|---|---|---|
| JUSTIN LEE POSEY, | ) | |
| | ) | Case No. 1:22-cv-170 |
| *Plaintiff*, | ) | |
| | ) | Judge Travis R. McDonough |
| v. | ) | |
| | ) | Magistrate Judge Christopher H. Steger |
| CITY OF CLEVELAND, TENNESSEE, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

---

## MEMORANDUM OPINION

---

Before the Court is Defendant City of Cleveland, Tennessee ("the City"), Seth Snyder, and Stephen Warner's motion for summary judgment (Doc. 30).[1]  For the reasons that follow, the Court will **GRANT** the motion (*id.*).

## I.     BACKGROUND

In the fall of 2019, multiple young women reported incidents of harassment to the City of Cleveland Police Department ("CPD").  (Doc. 1-2, at 7–8.)  The first report came from Abigail Barnette, then a student at Lee University in Bradley County,[2] on or about November 15, 2019.[3] (*Id.*)  According to Barnette, a "slender white male with a thin mustache" driving a silver four-door Honda Accord with a temporary tag trailed her while she was walking to her parked car.

---

[1] Though Jennah Pritchard is also a defendant in this matter, she has not jointly filed the present motion.  Thus, while the Court will collectively refer to the City, Snyder, and Warner as "Defendants," Pritchard is not included in this reference.

[2] Cleveland is a city in Bradley County.

[3] Posey states in his response to Defendants' summary-judgment motion that Barnette made a statement to CPD on November 15, 2019.  (Doc. 37, at 2.)  In Posey's complaint, he states the report was made on November 12, 2019.  (Doc. 1-2, at 8.)

(*Id.* at 8; Doc. 36, at 7.)  As the vehicle approached Barnette, she saw that the driver was masturbating while watching her.  (Doc. 1-2, at 8)  Barnette continued walking to her car, but the driver pulled in behind her vehicle and blocked her path for several minutes before allowing her to leave.  (*Id.*)

Two days later, Barnette reported to CPD that she saw the same silver Honda Accord parked at a Starbucks in Bradley County.  (*Id.*)  CPD dispatched Defendant Snyder, then an on-duty detective, to investigate.  (*Id.* at 9.)  When Snyder arrived, he encountered Plaintiff Justin Posey in the parking lot, sitting in a silver Honda.  (*Id.*)  Snyder approached Posey "in a friendly manner and asking him what his name was . . . [and] kind of hinted that [he] got called on [Posey] and his vehicle for suspicious activity."  (Doc. 28, at 47.)  After reviewing Posey's ID, Snyder left.  (Doc. 1-2, at 9.)  Snyder stated in his deposition that he "honestly didn't want to believe [the call on Posey] because he's a very well-spoken guy, comes from a good family. You know, you don't—you try not to, but you make judgments about people, who could do such a thing and who couldn't."  (Doc. 28, at 52–53.)

After leaving Starbucks, Snyder discussed the encounter with Barnette.  (*Id.* at 54.) Barnette then showed him a video she recorded of a silver car following her on a different occasion.  (*Id.*)  According to Snyder, the vehicle in the video "was the car that . . . Mr. Posey was in" at Starbucks.  (*Id.*)  By watching the video, Snyder said he could tell the car in the video, like the one he found Posey in at the Starbucks parking lot, "was a silver Honda" with a "drive-out tag."  (*Id.*)  That observation led Snyder to consider Posey as a possible suspect:

> You know, it could be real.  It could be an angry ex-girlfriend.  The amount of
> Hondas with drive-out tags in Cleveland is unfathomable.  So when you—when
> [Barnette] notified me that that was the vehicle and then showed me a video of
> that vehicle that day is kind of when it all came together for me, that [Posey]
> could possibly be a suspect.

(*Id.* at 55–56.)  Snyder added that "[Barnette's] description of [Posey's] facial features" contributed to his identification of Posey as a potential suspect.  (*Id.* at 56.)

On November 18, 2019, CPD received another report of harassment in the area.  (Doc. 1-2, at 9.)  Lara Sparkman told CPD that her seventeen-year-old daughter was approached by a "white male with a toboggan" when she was leaving dance practice near the same Bradley County Starbucks.  (*Id.*)  Snyder was dispatched to patrol the area, where he again found Posey. (*Id.* at 9–10.)  In the field report he wrote up on the incident, Snyder stated that the person Sparkman described "fit [Posey's] description," though, when he encountered him at Starbucks, Posey "was wearing a black ball cap, not a toboggan" as Sparkman described in her report. (Doc. 28, at 105.)

The next day, Defendant Jennah Pritchard, then a student at Lee University, reported to CPD that two men in a silver four-door sedan pulled up beside her as she was exiting the Burrito Xpress restaurant in Bradley County.  (Doc. 1-2, at 10.)  According to Pritchard, the driver seized her wrist while the passenger grabbed her keys and phone.  (*Id.*)  The driver ordered her to "[c]ome with us, we have some questions for you."  (*Id.*)  Pritchard responded that her father was still inside the Burrito Xpress.  (*Id.*)  The men then released Pritchard's wrist, dropped her belongings, and fled the scene.  (*Id.*)  In her report to CPD, Pritchard described the passenger as a "dark-haired male wearing a black hat."  (*Id.*)  CPD assigned Defendant Warner, then an on-duty detective, to investigate the incident.  (*Id.* at 11.)

Given the nature of the report's accusations, Warner "sent out a . . . department-wide email just stating a general overview of what had happened [to Pritchard]."  (Doc. 28, at 83.)  On November 20, 2019, Snyder responded to Warner's message.  (Doc. 28, at 64.)  The email response alerted Warner to Posey's status as a possible suspect:

There's been multiple incidents involving Justin Posey with harassment and indecent exposure around the village green, Lee University, and Hamilton County. He hangs out at the Village Green Starbucks every single night that I've been working and claims it to be, "his hangout."

I did a continuation report after a victim identified his car at starbucks 3 days after he followed her at Lee masturbating in his vehicle, she described his features perfectly and showed me a video of his exact same vehicle circling around her parked car at Lee. I also did an FI after a 17yr old female at the dance studio complained of a man fitting his description trying to get her attention as she was walking into the dance studio. I showed up and did an FI with Posey about 10min after that, parked at Starbucks.

He is a white male, black hair, mustache, and wears a black ball cap. His vehicle is a 4 door silver Honda, resembling a Ford Focus, with a drive out tag.

I will send you his info.

(Doc. 28, at 109.) Snyder clarified in deposition that the "multiple incidents" he mentions in the first line of his email refer to "the one at Lee [with Barnette] and the one that I got called to where [Posey] was present at Starbucks the second time." (*Id.* at 64.) When asked whether either incident occurred in Hamilton County as stated in the email, Snyder recognized the statement as a mistake:

I don't remember why I put that. I was probably doing two things at once.

. . .

I might have heard something from another person about something he did in Hamilton County or I could have been doing two things at once and actually bled onto this email from something involved in Hamilton County.

(*Id.* at 64–66.)

Snyder sent the email with the assumption Detective Warner "probably would have took [sic] my information that I had given him and used it to possible [sic] list Mr. Posey as a suspect and do his best to prove that he wasn't [a suspect]." (*Id.* at 65.) To Snyder, the information in

the email conveyed that "the description of the vehicle and the description of Mr. Posey fit" the reports. (*Id.* at 65.)

After receiving Snyder's email, Warner assembled a photographic lineup, which included a photograph of Posey, to present to Pritchard. (*Id.* at 68.) According to Warner, "[i]t was the details of the email . . . [and] matching the vehicle description Ms. Pritchard gave" that led him to put together the lineup. (*Id.* at 88.) When presented with the photo array, Pritchard immediately identified Posey as the passenger of the silver sedan at the Burrito Xpress. (Doc. 36, at 19–20.) Of the photographs shown, Posey was the only individual wearing an earring. (Doc. 28, at 92.) Warner said that he did not "believe th[e lineup] would be overly suggestive," because "[a]n earring was never mentioned in Ms. Pritchard's description of Mr. Posey." (*Id.* at 93.)

Though Warner had put together "a few" photo lineups while on patrol, this was the first one he had assembled as a detective. (Doc. 28, at 89–90.) Warner stated that he received "informal training" from CPD on this process through working with "more experienced detectives and officers." (*Id.* at 90.) From this training, Warner said he learned the following:

> [All the photographs] had to be—you know, the pictures all had to be similar in nature, like the background. They couldn't be—you know, they all had to be the same size. So with that information I generated [the photographs] from the same source, being the driver's license files, but also that, you know, the suspects had to be—or not suspects, the people in the lineup had to be similar features, similar characteristics. You obviously couldn't have a white suspect and make a lineup with one white male and give black males, things of that nature.

(*Id.* at 91.)

After Pritchard identified Posey from the photographic lineup, Warner spoke to his supervisor, who directed him to confer with a district attorney. (Doc. 28, at 95.) He then contacted then-assistant-district-attorney Coty Wamp[4] and "told her the totality of [the] case." (*Id.*) After Warner informed Wamp that Pritchard had identified Posey in a photographic lineup, Wamp advised Warner on what charges she thought were appropriate to bring against him. (*Id.*)

On November 21, 2019, Warner applied for and obtained a warrant for Posey's arrest. (Doc. 24, at 7.) Later that day, CPD officers arrested Posey. (Doc. 28, at 20.) A grand jury indicted Posey on February 20, 2020. (Doc. 28, at 127.) Before Posey's case went to trial, however, the Bradley County Criminal Court ("County Court") ruled that evidence of Pritchard's identification of Posey from Warner's photographic lineup was inadmissible. (*See id.* at 128–42.) The County Court based its ruling in part on the presence of the earring in only Posey's photograph. (*Id.* at 137.) On December 3, 2021, the County Court dismissed the charges against Posey. (*Id.* at 121–24.)

On June 6, 2022, Posey brought the present action in the Tennessee Circuit Court for the Eleventh Judicial District in Bradley County, alleging claims for malicious prosecution against all Defendants and claims for "deprivation of constitutional rights" against Defendants Snyder, Warner, Fox, and CPD.[5] (Doc. 1-2, at 15–20.) On June 27, 2022, the City removed this action to federal court. (*Id.*) On July 17, 2023, Defendants Snyder, Warner, and the City moved for summary judgment as to all claims against them. (Doc. 30.) The motion is ripe for review.

---

[4] At the time, Coty Wamp was an assistant district attorney in Bradley County.

[5] All Defendants but Snyder, Warner, Pritchard, and the City have since been dismissed.

## II.    STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003).  The moving party may meet this burden either by affirmatively producing evidence establishing that there is no genuine issue of material fact or by pointing out the absence of support in the record for the nonmoving party's case.  *Celotex*, 477 U.S. at 325. Once the movant has discharged this burden, the nonmoving party can no longer rest upon the allegations in the pleadings; rather, it must point to specific facts supported by evidence in the record demonstrating that there is a genuine issue for trial.  *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).

At summary judgment, the Court may not weigh the evidence; its role is limited to determining whether the record contains sufficient evidence from which a jury could reasonably find for the non-movant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).  A mere scintilla of evidence is not enough; the Court must determine whether a fair-minded jury could return a verdict in favor of the non-movant based on the record.  *Id.* at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).  If not, the Court must grant summary judgment.  *Celotex*, 477 U.S. at 323.

### III.    ANALYSIS

The majority of Posey's claims against Defendants are for violations of his constitutional rights pursuant to 42 U.S.C. § 1983, which provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any . . . person . . . to the deprivation of any rights . . . secured by the Constitution and laws [of the United States], shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

To succeed on a claim under § 1983, a plaintiff must show:  "(1) that he or she was deprived of a right secured by the Constitution or laws of the United States; and (2) that the deprivation was caused by a person acting under color of law."[6]  *Robertson v. Lucas*, 753 F.3d 606, 614 (6th Cir. 2014) (citations omitted).

The doctrine of qualified immunity, however, shields individual government officials from damages under § 1983 "as long as their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Sumpter v. Wayne Cnty.*, 868 F.3d 473, 480 (6th Cir. 2017) (internal quotation marks omitted) (quoting *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009)). In deciding whether a defendant is entitled to qualified immunity at the summary-judgment stage, the Court employs a two-part test.  *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009)).  First, a court determines whether the facts, viewed in the light most favorable to the plaintiff, show that the official violated a constitutional right.  *Holzemer v. City of Memphis*, 621 F.3d 512, 519 (6th Cir. 2012) (citations omitted).  Second, if a constitutional right was violated, a court determines whether the right was clearly

---

[6] Only the first element is at issue in this case, as Defendants do not dispute that they were acting under color of state law at the time of the relevant events.  They instead argue that their actions did not violate the Constitution and that they are entitled to qualified immunity.

established at the time the violation occurred. *Id.* (citations omitted). The plaintiff bears the burden of "satisfy[ing] both inquires in order to defeat the assertion of qualified immunity." *Sumpter*, 868 F.3d at 480 (citing *Wesley v. Campbell*, 779 F.3d 421, 428–29 (6th Cir. 2015)). "[I]f the district court determines that the plaintiff's evidence would reasonably support a jury's finding that the defendant violated a clearly established right, the court must deny summary judgment." *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015) (citing *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 681 (6th Cir. 2013)).

A right is clearly established when, "at the time of the challenged conduct, the contours of [the] right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (cleaned up) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Id.* (citations omitted). Courts should not attempt to define a particular right at a high level of generality. *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *al-Kidd*, 563 U.S. at 742). Instead, they should assess whether it is clearly established that the particular conduct is unconstitutional. *Id.* ("This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." (citations and internal quotation marks omitted)). Still, "[i]t is not necessary[] . . . 'that the very action in question has previously been held unlawful.'" *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866–67 (2017) (quoting *Anderson*, 483 U.S. at 640); *see also id.* at 1867 ("[A]n officer might lose qualified immunity even if there is no reported case 'directly on point.'" (citations omitted)). That is, "[t]here need not be a case with the exact same fact pattern or even 'fundamentally similar' or 'materially similar' facts," as long as the defendants had "fair warning" that their conduct

violated the plaintiff's rights. *Goodwin v. City of Painsville*, 781 F.3d 314, 325 (6th Cir. 2015) (citations omitted); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.").

### A.    "Malicious Prosecution" (Fourth Amendment)

Posey brings malicious-prosecution claims against Defendants, citing Warner's allegedly suggestive photographic lineup and Snyder's email alerting Warner to Posey's potential status as a suspect. (Doc. 1-2, at 15–17.) Defendants argue Posey has not presented evidence sufficient for a reasonable juror to find either action amounts to constitutional injury. (Doc. 31, at 7–14.)

"The Sixth Circuit recognizes a separate constitutional claim of malicious prosecution under the Fourth Amendment, which 'encompasses wrongful investigation, prosecution, conviction, and incarceration.'" *Dixon v. Ginley*, No. 1:13-cv-489, 2013 WL 2425132, at *7 (N.D. Ohio June 3, 2013) (quoting *Barnes v. Wright*, 449 F.3d 709, 715–16 (6th Cir. 2006)). A malicious-prosecution claim premised on a Fourth Amendment violation is comprised of the following four elements: (1) "a criminal prosecution was initiated against the plaintiff and [] the defendant ma[d]e, influence[d], or participate[d] in the decision to prosecute"; (2) "there was a lack of probable cause for the criminal prosecution"; (3) "as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty"; and (4) "the criminal proceeding was resolved in the plaintiff's favor." *Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010).

Given the broad umbrella of potential injuries encompassed by a malicious-prosecution claim, the Sixth Circuit has advised courts to "unpack" such claims "and look to

the actual injury alleged in order to apply the correct legal analysis." *Gregory v. City of Louisville*, 444 F.3d 725, 757 (6th Cir. 2006). Such an exercise is of particular import here, as Posey has essentially duplicated the allegations supporting his malicious-prosecution claim for his deprivation-of-rights claim. (*See* Doc. 1-2, at 15–19.)

> ### i. *Warner's Photographic Lineup*

When one "unpacks" Posey's malicious-prosecution claim against Warner, it becomes apparent the claim hinges on Warner's assembly of the photographic lineup. (*See* Doc. 1-2, at 16 (Posey alleging in his complaint that Warner "presented the 11/21/19 Photo Identification Form to Pritchard in a manner designed to elicit [her] false identification of Mr. Posey," and that he "acted with reckless disregard for the truth of Pritchard's identification of Mr. Posey by requesting an arrest warrant for, and initiating criminal proceedings against, Mr. Posey").) But the Sixth Circuit has held that "an unduly suggestive identification does not, in and of itself, violate constitutional rights." *Gregory v. City of Louisville*, 444 F.3d 725, 747 (6th Cir. 2006) (citing *Manson v. Brathwaite*, 432 U.S. 98, 113 (1977)); *see Harper v. Bohanan*, No. 3:97-cv-80, 2007 WL 9734415, at *10 (E.D. Tenn. Feb. 8, 2007) ("[E]ven even if the photographic lineups were unnecessarily suggestive, the flawed lineups do not violate a constitutionally protected interest sufficient to merit damages under Section 1983."). Rather, "[t]o rise to the level of a constitutional violation actionable under § 1983, the evidence obtained through a lineup must be used at trial." *Brown v. City of Detroit*, No. CV 12-13402, 2017 WL 2532964, at *2 (E.D. Mich. Mar. 7, 2017), *report and recommendation adopted*, No. 12-13402, 2017 WL 2500995 (E.D. Mich. June 9, 2017) (citing *Hutsell v. Sayre*, 5 F.3d 996, 1005 (6th Cir. 1993)). Because it is undisputed that the lineup was never presented at trial, the Court will grant

summary judgment as to Warner on Posey's malicious-prosecution claim against him.  (*See* Doc. 28, at 121–24 (showing that the County Court dismissed all charges against Posey on December 3, 2021).)[7]

### ii.  *Snyder's Email*

Posey also argues Snyder's email to Warner was riddled with factual inaccuracies and led to his prosecution.  (*See* Doc. 1-2, at 16 ("Snyder acted with reckless disregard for the truth" of Barnette's statements and ID of Posey, which led Warner to suspect him.).)  Specifically, Posey claims there are three lies in Snyder's email:  (1) that some of the incidents described in his email occurred in Hamilton County; (2) that Barnette showed Snyder a video of the same vehicle circling her parked car at Lee; and (3) that Sparkman's description of the person who accosted her daughter matches Posey.  (Doc. 37, at 11.)  Defendants respond that Snyder did not participate in Posey's prosecution and that, even if he did, the decision was supported by probable cause.

An officer's deliberate fabrication of evidence that results in a defendant's wrongful indictment is the "prototypical case of malicious prosecution."  *Mills*, 869 F.3d at 480.  In fabrication-of-evidence cases, the first element of a malicious-prosecution claim—the defendant's participation in the decision to prosecute—eclipses the second—the absence of probable cause.  *See France v. Lucas*, 836 F.3d 612, 629 (6th Cir. 2016) ("A plaintiff does

---

[7] It is true that a suggestive photographic lineup alone can form the basis of a Section 1983 claim when certain extraordinary circumstances are present, but the appropriate avenue for such an argument is a Fourteenth Amendment due-process claim, not a Fourth Amendment malicious-prosecution claim.  *See Harper*, 2007 WL 9734415, at *9 ("The Sixth Circuit noted that a plaintiff might be able to state a Section 1983 claim in 'extraordinary circumstances,' such as 'coercion or other police misconduct.'") (citing *United States v. Rice*, 66 F. App'x. 591, 595 (6th Cir. 2003)).  As such, the Court will take up this issue in its analysis of Posey's Fourteenth Amendment arguments, *see infra* Section III.B.

not need to show that the government lacked probable cause to prevail on a fabrication of evidence claim."). This means that a plaintiff need not show the government lacked probable cause to prevail on a fabrication-of-evidence claim; his focus instead centers on whether the officer participated in the decision to prosecute. *Id.* An officer participates in the decision to prosecute when he: (1) "provide[s] reports, affidavits, or other investigative materials containing falsehoods, omissions, or misstatements to a prosecutor"; (2) those materials formed the basis for the charge or otherwise "ultimately influenced a plaintiff's continued detention"; and (3) the falsehoods, omissions, or misstatements were made deliberately or with reckless disregard for the truth. *Meeks v. City of Detroit, Mich.*, 727 F. App'x 171, 178–179 (6th Cir. 2018) (internal citations and quotation marks omitted); *see Shaw v. City of Ferndale*, No. 18-12973, 2020 WL 1324032, at *8 (E.D. Mich. Mar. 20, 2020) ("A police officer can be found liable for malicious prosecution when he knowingly submits false information to the prosecutor that formed the basis of the charging decision.) (citing *Sykes*, 625 F.3d at 315-16). An officer's mere lack of diligence in investigating the veracity of certain allegations will not amount to participation. *Id.* (citing *Johnson*, 790 F.3d at 652). Nor will "alleged mischaracterizations in an officer's affidavit [that] were 'not so far off the mark . . . [as] to permit an inference of deliberate or reckless disregard for the truth." *Id.* (quoting *Newman*, 773 F.3d at 772 ).

Posey has not presented evidence from which a reasonable juror could find Snyder participated in Posey's prosecution by emailing Warner. As a preliminary matter, Snyder did not "provide[] reports, affidavits, or other investigative materials . . . to a prosecutor." The only recipient of Snyder's email was Warner; nothing in the record supports that its contents were ever shared—directly or indirectly—with assistant-district-attorney Wamp.

13

By all accounts, Wamp's recommendation to prosecute Posey was based on Pritchard's selection of his photo from the lineup Snyder prepared, not Snyder's email to Warner.

Sure, one may argue Snyder's email was the "but for cause" of Posey's prosecution; had Snyder not drawn connections between Pritchard's report and other reports of harassment in the area, Warner may not have put together the photo lineup that to Posey's prosecution. But Posey has not identified—and this Court's independent search has failed to reveal—any case law suggesting such an attenuated link constitutes "participation" in the context of a malicious-prosecution claim.[8] Rather, Posey stakes his entire "participation" argument on a Sixth Circuit case called *Sykes v. Anderson*, 625 F.3d 294 (6th Cir. 2010). (Doc. 37, at 12 (citing *Sykes*, 625 F.3d at 294).) The defendants in that case insisted they did not "participate" in the plaintiffs' prosecution because they themselves did not technically "make" the decision to prosecute—the prosecutor did. *Sykes*, 625 F.3d at 311. The Sixth Circuit swiftly rejected this argument: "the fact that [the defendant] did not *make* the decision to initiate the criminal proceedings against the [p]laintiffs is of no moment, as the record contains ample evidence that [the defendant] influenced or participated in the ultimate decision to prosecute the [p]laintiffs by way of his knowing misstatements to the prosecutor." *Id.* at 317. It is one thing to prevent an officer who made knowing misstatements directly to a prosecutor from "escap[ing] liability by pointing to the decision of [that] prosecutor[]"; it is another entirely to transpose an officer's participation in the very

---

[8] In fact, binding precedent suggests the opposite. *See Sykes v. Anderson*, 625 F.3d 294, 316 ("[I]n order to show that [the defendant officer] participated in or that his actions influenced the commencement of criminal proceedings as required to sustain a claim of malicious prosecution, the [p]laintiffs were required to present some evidence that the impact of [the defendant officer's] misstatements and falsehoods in his investigatory materials extended beyond the [p]laintiffs' initial arrest and ultimately influenced the [p]laintiffs' continued detention.").

early stages of investigation to a party's ultimate prosecution, as Posey urges the Court to do here. *Id.* Thus, Posey has not pointed to evidence from which a reasonable juror could find Snyder—by sending an email to another officer suggesting a link between reported incidents—participated in Posey's prosecution.

Beyond this deficiency, which is enough on its own to warrant summary judgment in favor of Snyder, each allegedly inaccurate statement in Snyder's email also independently fails to support a malicious-prosecution claim.

a.      Hamilton County

The first alleged falsity in Snyder's email is that one of the incidents involving Posey occurred in Hamilton County. (Doc. 37, at 11.) Snyder acknowledged in deposition that the statement was a mistake resulting from him "probably doing two things at once." (Doc. 28, at 271-72.)

This statement fails to support a malicious-prosecution claim for at least two reasons. First, Posey has not offered any evidence to support that the mistake was intentionally or maliciously made. On the contrary, Snyder testified that the reference to Hamilton County was an honest mistake. (Doc. 38, at 2, 5.) Second, Posey has not proffered any evidence to suggest the misstatement regarding Hamilton County was material to the charges brought against him. *See Shaw v. City of Ferndale*, No. 18-12973, 2020 WL 1324032, at *8 (E.D. Mich. Mar. 20, 2020) (finding that plaintiff's malicious-prosecution claim based on allegedly falsified information fails in part because "plaintiff provided no argument, nor cited any authority demonstrating, that [the allegedly falsified] information is material to the assault charge"). Thus, even though Snyder's inclusion of Hamilton County as a site of a reported incident was in error, Posey has not set forth

evidence from which a reasonable juror could find the error amounted to Snyder's participation in Posey's prosecution for malicious-prosecution purposes.

> ### b. Vehicle Match

The second alleged falsity in Snyder's email is that the video Barnette showed him depicts Posey's "exact same vehicle circling around her parked car at Lee." (Doc. 37, at 11.) Posey argues that the video "does not clearly depict a drive-out tag consistent with Barnett's description, nor does the video depict a vehicle circling Barnette's car." (*Id.*) From the Court's review, the at-issue video, taken by Barnette from inside her vehicle in a parking lot, shows a silver four-door Honda driving past her parked car then turning right towards the parking lot. *See Barnette Video*. At one point, the video zooms in on the rear of the vehicle, but it is difficult to make out any specific details of the area where a license plate is typically found. *Id.*

Posey has not pointed to evidence from which a reasonable juror could find Snyder's description of the video was deliberately or recklessly invented. Though the video may not "clearly depict a drive-out tag" or that the vehicle is "circling" Barnette's, Snyder's description of its contents are not "so far off the mark . . . [as] to permit an inference of deliberate or reckless disregard for the truth." *Shaw*, 2020 WL 1324032, at *8 (citation omitted). The video shows a silver four-door Honda driving past Barnette's parked vehicle, which accords with Barnette's initial description of the vehicle driven by the man she saw masturbating. (*See* Doc. 1-2, at 8 (Barnette describing the vehicle following her as a silver four-door Honda Accord with a temporary tag).) Posey has not offered any independent evidence that Snyder made the statement with a deliberate or reckless disregard for the truth.

c.      Posey Description Match

Finally, Posey argues Snyder fabricated the statement that Sparkman's description of

the man who accosted her daughter outside Starbucks matched Posey's characteristics.

(Doc. 37, at 11.)  The portion of the email Posey takes issue with states as follows:  "I also

did an FI after a 17yr old female at the dance studio complained of *a man fitting his*

*description* trying to get her attention as she was walking into the dance studio."  (Doc. 28,

at 109 (emphasis added).)  According to Posey, the descriptions did not match, because

"Snyder admits that Mr. Posey was wearing a black ball cap on the night of Sparkman's

call, not a gray toboggan as Sparkman indicated."[9]  (*Id.*)

Posey has not presented evidence from which a reasonable juror could find Snyder

invented—let alone, deliberately invented—this statement.  Snyder merely stated in his

email that the man Sparkman described "fit[ Posey's] description," an account consistent

with his field-memo notation that "Justin Posey fit the description" given by Sparkman.

(Doc. 28, at 105.)  Though it is true that Snyder took care to note in the memo, but not in the

email, that Posey "was wearing a black ball cap, not a toboggan," this minor discrepancy did

not change his overall impression that Posey "fit the description."[10]  (*Id.*)  Thus, as with his

description of Barnette's video, Snyder's omission of this caveat in the email is not a

mischaracterization that is "so far off the mark . . . [as] to permit an inference of deliberate

or reckless disregard for the truth."  *Shaw*, 2020 WL 1324032, at *8 (citation omitted).

---

[9] On November 18, 2019, Snyder reported in a field memo that "Justin Posey fit the
description [given by Sparkman], although, he was wearing a black ball cap, not a
toboggan."  (Doc. 28, at 105.)

[10] Snyder described Posey in his email to Warner as "a white male, black hair, mustache,
and wears a black ball cap."  (Doc. 28, at 103.)

Because none of the three alleged falsities in Snyder's email could be viewed as intentional fabrications of evidence forming the basis of Posey's prosecution, they are insufficient to support a malicious-prosecution claim against him. For this reason, the Court will grant Defendants' motion for summary judgment as to this claim.[11]

## B. Fourteenth Amendment Claims

### i. *Warner's Photographic Lineup*

Posey next argues that Warner's suggestive photographic lineup violated his Fourteenth Amendment right to due process. (Doc. 1-2, at 17–19.) Even if suggestive, a "preindictment identification procedure does not in itself intrude upon a constitutionally protected interest." *Hutsell v. Sayre*, 5 F.3d 996, 1005 (6th Cir. 1993) (quoting *Manson v. Brathwaite*, 432 U.S. 98, 113 n.13 (1977)); *see also Ramsey v. Rivard*, No. 20-13124, 2023 WL 6279901, at *15 (E.D. Mich. Sept. 26, 2023) ("[T]here is no clearly established right to be free from a suggestive identification procedure *per se*."). The procedure may encroach on one's due-process rights only if (1) the suggestive lineup deprived the individual of his right to a fair trial or (2) certain "extraordinary circumstances" exist. *Id.* For the first provision to apply, the lineup must have been presented at trial. *Brown*, 2017 WL 2532964, at *3, *report and recommendation adopted*, 2017 WL 2500995 ("To rise to the level of a constitutional violation actionable under § 1983, the evidence obtained through a lineup must be used at trial."). For the second provision to apply, a plaintiff must proffer some evidence of "extraordinary circumstances," such as "coercion or other police misconduct."

---

[11] Posey also accuses Snyder of failing to "take appropriate steps to preserve Snyder's bodycam footage from his November 14, 2019 interactions with Barnette and Mr. Posey and November 18, 2019 interaction with Mr. Posey. (Doc. 1-2, at 15.) Given this argument is only relevant in the context of Posey's Fourteenth Amendment Claim, the Court will address it in its discussion of that claim below, *see infra* Section III.B.iii.

*Hutsell*, 5 F.3d at 1005. "Historically, courts have recognized that th[e] use of force to extract an involuntary confession is actionable under § 1983 while a mere technical failure to follow court established rules of criminal procedure is not cognizable under § 1983." *Hensley v. Carey*, 818 F.2d 646, 650 n.4 (7th Cir. 1987)) (citation omitted).

Posey has not presented evidence to support either type of Fourteenth Amendment claim against Warner based on the photographic lineup. The indictment against Posey was dismissed prior to trial, and thus the lineup could not have deprived him of a fair trial. (Doc. 31, at 6.) Indeed, Posey never asserts a violation of the core right to a fair trial; instead, he argues Warner "presented the 11/21/19 Photo Identification Form to Pritchard in a manner designed to elicit Pritchard's false identification of Mr. Posey as one of the men who Pritchard claims approached her." (Doc. 1-2, at 18.) By focusing on Warner's assembly of the lineup, and not on the lineup's effect on the trial, Posey fails to appreciate that the "rule against admitting evidence from unnecessarily suggestive lineups[ ] is simply a prophylactic rule designed to protect the core right to a fair trial." *Hutsell*, 5 F.3d at 1005. In other words, the mere existence of a suggestive lineup is not constitutionally relevant and thus cannot form the basis of Posey's due-process claim against Warner. *Id.* Posey also has not pointed to any "extraordinary circumstances," such as police coercion through physical force or other egregious misconduct, that could support the second type of due-process claim applicable to photographic lineups. *See Hensley*, 818 F.2d at 650 n.4. Thus, even if Warner's lineup was unduly suggestive, Posey's due-process claim against him fails to support a constitutional violation under § 1983. The Court will therefore grant summary judgment on this issue to Defendants. *See Brown*, 2017 WL 2532964, at *3, *report and recommendation adopted*, 2017 WL 2500995 (granting summary judgment in favor of the

defendants when the plaintiff asserting a due-process claim for suggestive photographic lineup failed to provide evidence of coercive police conduct and when the lineup was never presented at trial).

### ii. Snyder's "False" Statements in the Email

Posey also relies on the contents of Snyder's email to Warner to support a Fourteenth Amendment claim. Though Posey does not explain how Snyder's email fits within a Fourteenth Amendment claim, he appears to argue that Snyder knowingly fabricated the email's contents for purposes of obtaining a conviction—an action the Sixth Circuit has recognized as violative of the Fourteenth Amendment. *See Miller v. Gettel*, No. 22-1034, 2023 WL 2945340, at *6 (6th Cir. Apr. 14, 2023) (quoting *Sanford v. City of Detroit*, 815 F. App'x 856, 859 (6th Cir. 2020)) ("The Fourteenth Amendment bars an officer from knowingly creating false evidence to obtain a conviction.").

As discussed in the Court's analysis of Posey's Fourth Amendment malicious-prosecution argument, *see supra* Section III.A., Posey has not pointed to any evidence suggesting Snyder knowingly lied in his email. Thus, to the extent Posey asserts a Fourteenth Amendment claim against Snyder based on his email to Warner, the Court will grant summary judgment in favor of Defendants.

### iii. Snyder's Failure to Preserve Body Cam Footage

Posey also appears to argue[12] that Snyder's alleged failure to preserve body cam footage of his interactions with Barnette violated his constitutional rights. The parties do

---

[12] It unclear what claim, if any, this allegation supports, as it is included—verbatim—under both the "malicious prosecution" and "deprivation of constitutional rights" headings in Posey's complaint. (*See* Doc. 1-2, at 11, 14.) Posey only passively mentions this allegation in the "facts and procedural history" section of his response to Defendants' motion for

not dispute that the body cam footage from the interaction was lost or discarded. (Doc. 28, at 56–57 (Counsel for Posey: "Now, was your body camera active at the time that you interacted with Ms. Barnette?" Snyder: "It would have been, yes." Counsel for Posey: "Was that footage preserved?" Snyder: "No, it wasn't.").) In his deposition, Snyder speculated that the footage was not preserved "because it was categorized as a miscellaneous event, which would have been the proper categorization at the time because all that was done was a report, nobody was arrested or charged, it would have been purged after 30 days." (*Id.* at 58.)

A police officer can violate an accused's due-process rights by withholding or suppressing exculpatory evidence. *See Jackson v. City of Cleveland*, 925 F.3d 793, 813–14 (6th Cir. 2019) (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)) ("The suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilty or to punishment, irrespective of the good faith or bad faith of the prosecution."); *see also Moldowan v. City of Warren*, 578 F.3d 351, 379 (6th Cir. 2009) ("[P]olice can commit a constitutional deprivation analogous to that recognized in *Brady* by withholding or suppressing exculpatory material."). Lost or destroyed evidence can also form the basis of a due-process violation. *Brooks v. Stoddard*, No. 1:11-cv-13675, 2014 WL 10712351, at *17 (E.D. Mich. Apr. 2, 2014), *report and recommendation adopted*, No. 11-cv-13675, 2015 WL 7180309 (E.D. Mich. Nov. 16, 2015) (citing *California v. Trombetta,* 467 U.S. 479, 489 (1984)) ("The *Brady* rule extends to evidence which is not suppressed, but is lost or destroyed").

---

summary judgment. (*See* Doc. 37, at 3 ("Snyder then spoke to Barnette in person, but his body camera footage from that interaction was not preserved.").)

The Sixth Circuit established two separate tests for determining whether a failure to preserve exculpatory evidence achieves constitutional significance. *See United States v. Wright*, 260 F.3d 568, 570 (6th Cir. 2001). The apparent utility of the unavailable evidence governs which test applies. The first test comes from the Supreme Court's *Trombetta* case and applies when the unavailable evidence is "materially exculpatory." *California v. Trombetta*, 467 U.S. 479, 485 (1988). Evidence is materially exculpatory when it "possess[es] an exculpatory value that was apparent before the evidence was destroyed [or lost], and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489. When the *Trombetta* test applies, a plaintiff does not need to show an officer acted in bad faith when causing the evidence's unavailability. *Id.* at 488. This is not true for the second test, which derives from another Supreme Court case, *Arizona v. Youngblood*. 488 U.S. 51, 58 (1988). The *Youngblood* test applies in cases where the lost evidence is merely "potentially useful," rather than "materially exculpatory." *Id.* When the *Youngblood* test applies, "a criminal defendant must show bad faith on the part of the government." *Wright*, 260 F.3d at 571 (citing *Youngblood*, 488 U.S. at 56). This is because "the government does not have 'an undifferentiated and absolute duty to retain and to preserve all material that might of conceivable evidentiary significance in a particular prosecution.'" *Id.* (quoting *Youngblood*, 488 U.S. at 58). An officer acts in bad faith for purposes of the *Youngblood* test when he had "'knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.'" *Id.* (quoting *Youngblood*, 488 U.S. at 56). For this reason, an officer's negligence—even gross negligence—in failing to preserve the subject evidence is not enough to satisfy the bad faith element of the *Youngblood* test. *Id.*

Here, Posey fails to support a Fourteenth Amendment evidence-suppression claim against Snyder. Posey has not presented any evidence that the lost bodycam footage possessed some known exculpatory value prior to its destruction; the footage can, at best, be classified as "potentially useful" to Posey's case. *See Trombetta*, 467 U.S. at 485. Therefore, the *Youngblood* test applies. This means Posey must point to some evidence Snyder acted in bad faith—that is, that he had "knowledge of the exculpatory value of the [bodycam footage] at the time it was lost or destroyed"—for the claim to go forward. *See Wright*, 260 F.3d at 571 (internal citation and quotation marks omitted). Posey has not done so. In fact, Snyder stated in his deposition that the footage was likely "purged after 30 days" because "it was categorized as a miscellaneous event" given "nobody was arrested or charged" during either interaction. (Doc. 36, at 58.) Even if the video was wrongly categorized, the error can at most be attributed to negligence, which is insufficient to demonstrate bad faith. *See Wright*, 260 F.3d at 571. And because Posey has presented no independent evidence that Snyder or any other CPD officer was somehow improperly motivated in disposing of the footage, a due-process claim premised on the lost evidence must fail.[13]

### C.   *Monell* Liability for the City

Posey also brings § 1983 claims against the City. (Doc. 1-2, at 15, 17.) The Supreme Court has held that municipalities and other local governments "can be sued

---

[13] Per the Court's above discussion, *see supra* Section III.A–B, the facts viewed in the light most favorable to Posey do not show that Snyder or Warner violated a constitutional right. For that reason, the Court need not proceed to the second prong of the qualified-immunity analysis to determine whether the officers receive qualified immunity. *See Holzemer*, 621 F.3d at 519 (holding that a plaintiff must demonstrate an official violated a constitutional right to strip the official of immunity).

directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). *Monell* clarified that local governments can also be liable under § 1983 for "constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision[-]making channels." *Id.* at 690–91. A local governmental entity, however, "cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691; *see also id.* at 694 ("Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."). A plaintiff seeking to subject a municipality to § 1983 liability for the actions of its officers "must show that the alleged federal right violation occurred *because of* a municipal policy or custom." *Thomas,* 398 F.3d at 429 (citing *Monell,* 436 U.S. at 694) (emphasis added).

A plaintiff may pursue any of four possible avenues to prove the presence of a municipality's illegal policy or custom: (1) by pointing to the existence of an illegal official policy or legislative enactment; (2) by demonstrating that an official with final decision-making authority ratified illegal actions; (3) by proving the existence of a policy of inadequate training or supervision; or (4) by showing there is a custom of tolerance or acquiescence of federal rights violations. *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019) (citing *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)). A custom or

policy—whether implicit or explicit—must be "so widespread as to have the force of law[,]" as characterized by the "persistent practices of state officials." *Gregory v. Shelby Cnty.*, 220 F.3d 433, 442 (6th Cir. 2000); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167 (1970).

Posey's *Monell* claim against the City also fails. At the most rudimentary level, Posey failed to allege liability against the City in his complaint. Posey broadly asserts that Warner and Snyder "were acting within the course and scope of their employment with the CPD." (Doc. 1-2, at 17, 20.) But the caselaw is clear that "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691. Instead, Posey must point to some illegal policy or custom that caused him constitutional harm, which he has not done. And even if Posey had pointed to some illegal policy or custom in his complaint, his *Monell* claim would fail on another level. Because Posey failed to evidentiarily support any of his constitutional claims against Snyder and Warner, he has not shown he has experienced any constitutional harm. *See supra* Section III.A–B. Such a failing is fatal to a *Monell* claim. *See Chambers v. Sanders*, 63 F.4th 1092, 1101 (6th Cir. 2023) (quoting *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014)) ("There can be no liability under *Monell* without an underlying constitutional violation."). Finally, Posey's *Monell* claim fails on a more granular level; even if Posey had alleged a *Monell* claim and shown he suffered constitutional violation, the claim still falls flat for lack of evidentiary support. In his response to Defendants' summary-judgment motion, Posey advances a failure-to-train theory of *Monell* liability based on CPD's alleged lack of training on how to assemble a photographic lineup. (Doc. 37, at 20–21.) According to Posey, because Warner

"was not even aware of the existence of CPD's policy [on photographic lineups]"[14] and did not "receive any formal training from CPD on how to assemble photographic lineups," "CPD was deliberately indifferent with regard to its officers' assembly of photographic lineups." (Doc. 37, at 20.) But Warner's obliviousness to the policy is insufficient to demonstrate the training was inadequate, and Warner stated in deposition that he had received informal training on assembling photographic lineups. *See Stewart v. City of Memphis*, 788 F. App'x 341, 346 (6th Cir. 2019) ("[T]that a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program.") (quoting *City of Canton*, 489 U.S. at 390–91) (internal quotation marks and citations omitted); (Doc. 28, at 91.) Through that training, Warner learned that "the pictures all had to be similar in nature, . . . [and] the people in the lineup had to be similar features, similar characteristics." (Doc. 28, at 91.) Posey does not appear to dispute this statement; he merely quibbles that the training was not "formal." (Doc. 37, at 20–21.) Posey, however, does not point to, and this Court is not aware of any, caselaw drawing a meaningful distinction between "formal" and "informal" training for purposes of *Monell* liability. Because Posey has not shown he suffered any constitutional violation, has not pointed to a specific policy or custom in his complaint, and has not proffered evidence to support the theory that the City failed to train its officers on how to assemble a photographic lineup, summary judgment will be granted in favor of Defendants.

---

[14] CPD's policy on photographic lineup directs officers to "select photographs which generally fit the witness's description of the suspect's characteristics and are consistent with the suspect photograph." (Doc. 37, at 20–21 (Posey quoting CPD's policy).)

D.      **State-Law Claims**[15]

Posey also appears to assert state-law claims for malicious prosecution against

Defendants.  (Doc. 1-2, at 17.)  Defendants argue they are entitled to summary judgment on this

claim for similar reasons that Posey's § 1983 Fourth Amendment claim must fail.[16]  (Doc.31, at

21–22.)

To establish a malicious-prosecution claim under Tennessee law, a plaintiff must

show that:  "(1) a prior suit or judicial proceeding was instituted without probable cause, (2)

defendant brought such prior action with malice, and (3) the prior action was finally

terminated in plaintiff's favor."  *Roberts v. Fed. Exp. Corp.*, 842 S.W.2d 246, 247–48

(Tenn. 1992) (citations omitted).

As the Court explained in its analysis of Posey's § 1983 malicious-prosecution

---

[15] Defendants also move for summary judgment on a false-imprisonment or false-arrest claim (Doc. 31, at 14), but Posey responds that he is not making a claim for false arrest or imprisonment (Doc. 37, at 16).  Therefore, to the extent any false-imprisonment or arrest claim is asserted, it is **DENIED AS MOOT**.

[16] In the event the Court grants summary judgment on Posey's federal claims, both parties request the state claims be remanded to the state court.  (Doc. 37, at 20 n.6); (Doc. 31, at 20–21.)

"When a case is removed from state to federal court on the basis of federal question jurisdiction, and subsequently federal claims are dropped from the case, leaving only state claims, a district court has broad discretion in deciding whether to remand the case to the state court."  *Ullmo v. Ohio Tpk. & Infrastructure Comm'n*, 126 F. Supp. 3d 910, 920 (N.D. Ohio 2005) (citations omitted); *see also* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . .").

Though no federal claims remain against Defendants, Posey's claims against non-moving Defendant Jennah Pritchard are still pending.  Therefore, the Court will not remand Posey's state-law claims against Defendants at this time.  *See Carpenter v. City of Flint*, No. 11-cv-10304, 2014 WL 632359, at *4 (E.D. Mich. Feb. 18, 2014) (declining to remand state-law claims to state court when federal claims remained pending against at least one defendant).

27

claim, Posey has not pointed to any evidence to support that Snyder or Warner[17] acted with malice in sending an email linking Posey to recent harassment reports or when assembling a photographic lineup, respectively. *See supra* Section III.A. Because Posey has not supported this essential element of a Tennessee malicious-prosecution claim, the Court need not address the other elements. The Court will grant summary judgment in favor of Defendants as to this claim.

---

[17] Posey also appears to include the City in its claim. Tennessee Code Annotated § 29-20-201—the Tennessee Governmental Tort Liability Act ("TGTLA")—governs tort liability for Tennessee's governmental entities and employees and provides, with some exceptions, that "all governmental entities shall be immune from suit for any injury which may result from the activities of such governmental entities wherein such governmental entities are engaged in the exercise and discharge of any of their functions, governmental or proprietary." In addition to affording immunity to governmental entities, the TGTLA also extends immunity to employees of those entities when the TGTLA "removes" governmental-entity immunity: "No claim may be brought against an employee . . . [when] the immunity of the governmental entity is removed by [the TGTLA.]" *Id.* § 29-20-310(b). In other words, the TGTLA does not provide governmental entities and employees with simultaneous immunity; when the TGTLA "removes" immunity for the governmental entity, a governmental employee may be held liable. *See Taylor v. Harsh*, No. M2019-01129COA-R3-CV, 2020 WL 864989, at *4 (Tenn. Ct. App. Feb. 21, 2020); *Colson v. City of Alcoa*, No. 3:16-cv-377, 2017 WL 1730911, at *12 (E.D. Tenn. May 2, 2017).

One instance in which the TGTLA "removes" governmental-entity immunity is for an "injury proximately caused by a negligent act or omission of any employee within the scope of his employment," *except* when the injury arises out of "false imprisonment pursuant to a mittimus from a court, false arrest, malicious prosecution, intentional trespass, abuse of process, libel, slander, deceit, interference with contract rights, infliction of mental anguish, invasion of right of privacy, or civil rights." Tenn. Code Ann. § 29-20-205(2) (emphasis added). The statute's reference to "'civil rights' has been interpreted to include claims arising under the U.S. Constitution and 42 U.S.C. § 1983 . . . . Stated another way, the [T]GTLA 'preserves immunity for suits claiming negligent injuries arising from civil rights violations.'" *Partee v. City of Memphis*, 449 F. App'x 444, 448 (6th Cir. 2011) (citing *Johnson v. City of Memphis,* 617 F.3d 864, 872 (6th Cir. 2010)). Therefore, if a plaintiff's state-law claims arise out of their § 1983 claims, the responsible governmental employee(s) may be held liable. *See Dillingham v. Millsaps*, 809 F. Supp. 2d 820, 854 (E.D. Tenn. 2011) (emphasis in original) (citations omitted) ("The TGTLA does not grant immunity to *individuals* for intentional acts.").

Because Posey's state-law claims appear to arise out of his § 1983 claims, the state-law claims may proceed against Defendants in their individual capacity but not against the City.

## IV.    CONCLUSION

For the aforementioned reasons, the Court will **GRANT** Defendants' summary-judgment motion (Doc. 30).  Accordingly, Posey's Fourth Amendment malicious-prosecution claims, state malicious-prosecution claims, and Fourteenth Amendment due-process claims against Defendants Snyder, Warner, and the City are hereby **DISMISSED.**  Because no claims remain against them, Defendants Snyder, Warner, and the City are **DISMISSED** from this case.

With these defendants' dismissal, Defendant Jennah Pritchard is the only remaining defendant in this matter.  From the Court's review of the evidence, Pritchard merely confirmed in deposition that she selected Posey's picture from the photographic lineup Warner assembled and that she reported an 85% level of certainty that Posey was the person who accosted her.  (Doc. 36, at 20–22.)  Posey does not appear to dispute this testimony, and it is unclear from Posey's complaint how this evidence could support a malicious-prosecution claim against her.  For that reason, Posey is hereby put **ON NOTICE** that the Court intends to grant summary judgment in favor of Defendant Pritchard pursuant to Rule 56(f)(1).  *See* Fed. R. Civ. P. 56(f) (providing that a court may upon notice and an opportunity to respond, enter summary judgment "on grounds not raised by a party").  Any responses by the parties to this notice must be filed on or before **February 2, 2024**.

**SO ORDERED.**

/s/ *Travis R. McDonough*
**TRAVIS R. McDONOUGH**
**UNITED STATES DISTRICT JUDGE**